[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 25, 2004
THOMAS K. KAHN
CLERK

_____

No. 01-16064

_____

D. C. Docket No. 00-03414-CV-BBM-1

COVAD COMMUNICATIONS COMPANY,
DIECA COMMUNICATIONS, INC.,
d.b.a. Covad Communications Company,

Plaintiffs-Appellants,

versus

BELLSOUTH CORPORATION,
BELLSOUTH TELECOMMUNICATIONS, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(June 25, 2004)**

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

Before BARKETT and MARCUS, Circuit Judges, and HIGHSMITH*, District
Judge.

_____

\*Honorable Shelby Highsmith, United States District Judge for the Southern District of
Florida, sitting by designation.

BARKETT, Circuit Judge:

After our decision in this case was issued on August 2, 2002, Covad Communications Co. v. BellSouth Corp., 299 F.3d 1272 (11th Cir. 2002), the Supreme Court vacated our judgment and remanded for further consideration in light of its recent decision in Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 124 S. Ct. 872 (2004). Having carefully reviewed this opinion, we find that Trinko's interpretation of Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985), the leading case finding liability under § 2 of the Sherman Act for refusal to cooperate with a rival, now forecloses several (but not all) of Covad's claims. Other claims are now barred by our recent en banc decision in BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, Inc., 317 F.3d 1270 (11th Cir. 2003) ("MCIMetro II").

This suit was brought by Covad, a DSL internet service provider, against BellSouth, a regional telephone service provider that also sells DSL service. Covad and BellSouth entered into an interconnection agreement pursuant to the 1996 Federal Telecommunications Act ("FTCA") to allow Covad to provide DSL service over BellSouth's existing telephone lines. Covad alleged that BellSouth had engaged in exclusionary conduct that violated the Sherman Antitrust Act, the FTCA, and various state anti-monopoly statutes. Covad also made various state

2

breach of contract and tortious interference with business relations claims.[1]

On BellSouth's 12(b)(6) motion to dismiss for failure to state a claim, the trial judge threw out all of the counts relating to the Sherman Act except for two, allowing Covad to proceed with its allegations of predatory advertising and monopoly leveraging. The district court also allowed Covad's counts under state antitrust law and state law for tortious interference with business relations.[2] All other causes of action, the district court found, addressed conduct implicated by the FTCA, and as such failed to state claims under the Sherman Act.

On appeal, we held first that the FTCA's savings clause,[3] as well as evidence of congressional and executive intent, unambiguously showed that there was no plain repugnancy between the FTCA and the Sherman Act, and thus that there could be no implied repeal of or immunity from the antitrust laws.

Second, in reviewing the district court's ruling that Covad had failed to state an antitrust claim, we found that Covad's causes of action under the Sherman Act

_____

[1] Only one of Covad's twenty-four counts relied directly and explicitly on the FTCA: count four, misappropriation of confidential customer information.

[2] The parties later stipulated to the dismissal with prejudice of all of these surviving counts. A judgment dismissing the action in its entirety was issued on October 11, 2001.

[3] The FTCA provides that "nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws." Telecommunications Act of 1996, sec. 601(b)(1), § 152 note, 110 Stat. 56, 143 (1996).

fell into three kinds of alleged anticompetitive conduct: denial of the use of "essential facilities" (the network of phone lines); a refusal to deal; and price squeezing.[4] The first two categories of conduct (essential facilities and refusal to deal) relied on the same set of alleged facts: sometimes an outright denial of access to BellSouth's network and facilities, sometimes a denial of access on reasonable terms, with monopolistic intent. We concluded that, on a motion to dismiss, Covad had pleaded facts sufficient to meet the "exceedingly low" threshold for stating an antitrust claim with respect to all three categories of conduct. Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., 711 F.2d 989, 995 (11th Cir. 1983). We also reversed the district court's dismissal of Covad's breach of contract, FTCA, and tortious interference with business relations claims.[5] We now revisit Covad's claims in light of Trinko.

---

[4] We treated Covad's monopoly leveraging claim as a theory that applied to all three categories of BellSouth's alleged anticompetitive conduct, rather than as a distinct count. As for Covad's predatory advertising claim, we note only that Trinko does not seem to bar Covad from proceeding with this cause of action, assuming that it not implicate any duties under the FTCA.

[5] The district court dismissed the breach of contract and FTCA claims for lack of jurisdiction, finding that they must first be presented to state public service commissions (PSCs). In reversing these dismissals, we relied on BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs. Inc., 278 F.3d 1223 (11th Cir. 2002) ("MCIMetro I"), which held that the state PSCs did *not* have jurisdiction to interpret and enforce interconnection agreements under the FTCA. Having found that the FTCA savings clause did not supersede other state or national laws, we reversed the trial judge's dismissal of the state law tortious interference claims as preempted by the FTCA.

4

I. <u>Trinko</u>

We begin by noting that the Court in <u>Trinko</u> approved our view that the FTCA savings clause barred a finding of implied antitrust immunity. <u>Trinko</u>, 124 S.Ct. at 878. Thus, it is now clear that the FTCA and the Sherman Act were expressly intended to coexist. Emphasizing that the FTCA also does not create new claims that go beyond existing antitrust standards, <u>id.</u>, the Court then proceeded to consider whether the conduct of which Trinko complained violated the Sherman Act.

<u>Trinko</u> originated in a complaint brought by AT&T and other competitive local exchange carriers ("CLECs") before the New York Public Service Commission ("PSC") and the Federal Communications Commission ("FCC"). The complaint alleged that Verizon, the incumbent LEC in New York state, had failed to fulfill its obligations under 47 U.S.C. § 251(c)(3) to provide access to Verizon's operations support systems ("OSS"), one of several "unbundled network elements." OSS access allows a CLEC to relay orders for service through an electronic interface with Verizon's ordering system, thus enabling a CLEC to fill its customers' orders. Trinko alleged that Verizon had delayed the filling of, or neglected to fill at all, CLEC customer orders. The FCC and the New York PSC opened parallel investigations of Verizon that led to a series of PSC orders and an

5

FCC consent decree. The day after Verizon entered its consent decree with the FCC, one of AT&T's customers, the Trinko law firm, brought a claim under § 2 of the Sherman Act. Trinko argued that Verizon's failure to fulfill its § 251(c)(3) obligations was part of an anti-competitive scheme to discourage customers from becoming or remaining clients of CLECs. Such conduct, Trinko alleged, constituted a refusal to deal with rival firms under § 2 of the Sherman Act. As the Supreme Court describes it, Trinko's complaint set forth only a single example of the alleged failure to provide adequate access: the discriminatory handling of CLEC customer orders that led to the PSC and FCC investigations.

The Court held, first, that Trinko failed to state a recognized Sherman Act claim under existing refusal-to-deal precedents. Trinko, 124 S.Ct. at 880. The Court found that Verizon's failure to provide OSS assistance to AT&T did not amount to an effort at monopolization. Rejecting Trinko's reliance on Aspen, the Court noted that Aspen was "at or near the outer boundary of § 2 liability." Id. at 879. The case before the Court involved none of the Aspen indicators of anticompetitive conduct and so did not fit within Aspen's "limited exception." Id. at 880.

In particular, the Court observed that Aspen involved a unilateral termination of a "voluntary (*and thus presumably profitable*) course of dealing."

Id. (emphasis in original). But Trinko's complaint, the Court noted, "does not allege that Verizon voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion." Thus, Verizon's "prior conduct sheds no light upon the motivation of its refusal to deal." Id. Furthermore, the two cases differed in terms of pricing behavior. In Aspen the defendant's rejection of an offer to sell its services to a competitor "*even if compensated at retail price*," id. (emphasis in original), could support the requisite inference of monopolistic intent. By contrast, Verizon's reluctance to interconnect at the cost-based rate of compensation under §251(c)(3) is a neutral fact that does not support an inference of monopolistic intent. Id.

More fundamentally, the Court found that Aspen involved a defendant whose failure to sell even at retail cost to a competitor was a failure to sell otherwise publicly marketed services. In the case before it, the Trinko Court noted, "the services allegedly withheld are not otherwise marketed or available to the public." Id. at 880. The FTCA had created a "brand new" sharing obligation: "the wholesale market for leasing network elements." Id. (quoting Verizon Communications v. FCC, 535 U.S. 467, 528 (2002)).

In support of its § 2 claims, Trinko also argued that Bell Atlantic failed to provide AT&T with access to its "essential facilities." The Trinko Court rejected

this argument to the extent that it was distinct from Trinko's general § 2 argument. Trinko, 124 S.Ct. at 881. Despite having been invoked by some lower courts, observed Justice Scalia, this doctrine has never been recognized by the Supreme Court as established law, and in any case AT&T was not in fact deprived of such access. Id. at 880-81 (relying on P. Areeda & H. Hovenkamp, Antitrust Law (2003 Supp.), for the proposition that essential facilities claims should be denied where a state or federal agency has the power to compel and regulate sharing).

In the final part of its opinion, the Court observed that the FTCA created a broad and detailed regulatory environment that effectively abrogated the need for antitrust scrutiny in the case before it. The PSC and FCC investigations, orders, and consent decree in Trinko showed that the FTCA's distinctive regulatory regime was working just as Congress intended it to. The Court stated that federal courts are ill-equipped to handle cases alleging violations of 251(c)(3) duties to provide access because such allegations involve complex and constantly changing interactions between competitive and incumbent LECs. Antitrust courts should not be in the business of supervising highly detailed decrees on an ongoing basis. The Court noted that the FTCA does not authorize judges to invoke the Sherman Act in this context; rather, the 1996 act is itself an effective and even more ambitious mechanism for regulating the telecom industry. Trinko, 124 S. Ct. at

8

881-83. The FTCA attempts nothing less than to "eliminate the monopolies enjoyed by the inheritors of AT&T's local franchises." Id. at 883 (quoting Verizon, 535 U.S. at 476). By contrast, § 2 of the Sherman Act seeks merely "to prevent *unlawful monopolization*." Trinko, 124 S. Ct. at 883 (emphasis in original).[6]

## II. Covad's Claims after Trinko

As noted, we grouped Covad's Sherman Act claims into three forms of alleged anticompetitive conduct: refusal to deal, essential facilities, and price squeezing.

Trinko requires us, first, to reconsider whether Covad's refusal-to-deal allegations, if true, would state an antitrust claim under the "limited exception" of Aspen. Trinko, 124 S. Ct. at 880. In our earlier opinion, we distinguished Aspen from the instant case by noting that Covad was both customer and competitor of BellSouth, whereas the Aspen parties were solely competitors of each other. Trinko, however, treats the interconnection agreement between AT&T and Verizon as a mandatory accord between competitors, not a voluntary agreement

---

[6] In a concurring opinion, Justices Stevens, Souter, and Thomas found that Trinko had no standing to bring an antitrust claim in this case. Only AT&T could do so.

9

between customers. Trinko, 124 S. Ct. at 880. That Verizon also supplies wholesale unbundled network elements at a cost-based rate to AT&T does not, in the Court's view, make the relationship a non-competitive one. Moreover, Trinko now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim under Aspen. The relationship between AT&T and Verizon was mandated by the FTCA, and thus cannot be said to have initiated a "voluntary" course of dealing, profitable or otherwise. For the same reason, Verizon cannot be said to have failed to make available to AT&T otherwise publicly marketed services, whether at retail or a lower cost. Trinko emphasizes the coercive effect of the FTCA on incumbent LECs such as Verizon who – but for the FTCA – would not be required to make their network elements (including OSS) available to third parties such as AT&T. In short, Covad's refusal-to-deal claims do not survive Trinko and must be dismissed.

We consider next whether our application of the essential facilities doctrine to Covad's claims under this theory satisfies Trinko. Our earlier opinion quoted Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 65 F.3d 1406, 1413 (7th Cir. 1995), to the effect that the essential facilities doctrine has been endorsed by the Supreme Court and remains valid until rejected by it. In Trinko, however, the Court stated that it would neither endorse nor reject the

10

essential facilities doctrine.  <u>Trinko</u>, 124 S.Ct. at 881.  By contrast, the Court does endorse the view of two antitrust scholars that the doctrine is only viable where there is indeed unavailability of access.  <u>Id.</u>  Where a state or federal agency is authorized to compel access to a competitor's infrastructure, as under the FTCA, <u>Trinko</u> states that an essential facilities claim should be denied.  <u>Id.</u>  Thus, Covad's allegations under the essential facilities doctrine also fail to survive <u>Trinko</u>.

Third, we must consider whether Covad's price squeezing allegations are now a matter for FTCA regulatory enforcement rather than antitrust law.  As to these allegations, <u>Trinko</u> does not offer any definitive guidance.  The plaintiffs' amended complaint in <u>Trinko</u> did not state any price squeezing claims, and the Court did not specifically address the issue in its opinion.  BellSouth argues that the Fourth Circuit dismissed a price squeezing claim similar to Covad's in <u>Cavalier Telephone, LLC v. Verizon Virginia, Inc.</u>, 330 F.3d 176, 181, 190 (4th Cir. 2003), and that the Supreme Court's denial of certiorari in that case, 124 S. Ct. 1144 (2004), supports affirming the district court's judgment in the instant case.  But the "denial of a writ of certiorari imports no expression of opinion upon the merits of the case."  <u>United States v. Carver</u>, 43 S.Ct. 181, 182 (1923).

We believe Covad's price squeezing claim survives because it is based on traditional antitrust doctrine and is not specifically barred by <u>Trinko</u>.  As such,

11

however, Covad's complaint must contain allegations that the two basic prerequisites for a showing of price predation under § 2 of the Sherman Act have been met. Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993) (finding that the prerequisites for recovery on a claim of price predation under § 2 of the Sherman Act are the same as those for recovery on a claim of price discrimination under the Robinson-Patman Price Discrimination Act, 15 U.S.C. § 13(a)). First, Covad must allege that "the prices complained of are below an appropriate measure of its rival's costs." Brooke Group, 509 U.S. at 222. Second, Covad must allege that BellSouth had "a dangerous probability[] of recouping its investment in below-cost prices." Id. at 224. Rereading Covad's complaint, we find that the allegations contained therein, although not as closely tied to these two prerequisites as they could have been, are sufficient to state a claim under § 2 of the Sherman Act.

With respect to the first requirement, Covad alleges that

The wholesale prices BellSouth offers to ISPs for DSL service, as well as its retail prices for combined DSL and Internet access service, are set so low relative to its unbundled wholesale loop prices that Covad cannot meet BellSouth's wholesale or retail prices and still make a reasonable return on its investment. If Covad charged retail DSL/Internet access customers the same price as BellSouth does, or charged comparable wholesale DSL prices, Covad could not recover the cost of providing the service, e.g., loop costs, collocation costs, transport costs, corporate overhead and sales and market costs.

12

Covad Complaint at ¶ 92.  Whether the last sentence in this passage reflects "an appropriate measure of [BellSouth's] costs," Brooke Group, 509 U.S. at 222, is a factual matter for the district court to determine at a later stage of proceedings.  For purposes of the pleading stage, Covad's complaint meets the first Brooke Group prerequisite for a showing of price predation.

> With respect to the recoupment requirement, Covad alleges that
>
> If BellSouth had charged itself the same wholesale price for loops, BellSouth could not make a profit from its DSL service at current prices. . . BellSouth achieves the unlawful price squeeze by allocating costs so as to apportion only a *de minimis* cost to the loops over which it provides its own DSL service. . . As the costs are presently allocated, BellSouth must necessarily realize a significantly higher profit margin on its wholesale sales (for which it faces no competition) than it does on the corresponding retail sales (for which Covad is attempting to compete).  BellSouth intended this artifical cost allocation to harm Covad, and it did.

Covad Complaint at ¶¶ 93-95.  These allegations suggest that BellSouth is compensating for deliberately reduced profits on the retail end of its operations with correspondingly greater profits on the wholesale side, in order to stifle competition from firms such as Covad that are both wholesale customers and retail rivals.  We find that these allegations are sufficient to allege "a dangerous probability" that BellSouth will "recoup[] its investment in below-cost prices." Brooke Group, 509 U.S. at 224.  Whether the facts contained in Covad's

13

complaint and in the record will bear out the recoupment allegation against BellSouth is also a matter for the district court to determine at a later stage, not on the basis of a motion to dismiss for failure to state a claim. Taken together, Covad's price predation allegations meet the "exceedingly low" threshold of sufficiency that a complaint must meet to survive a 12(b)(6) motion. Quality Foods, 711 F.2d at 944-95 (finding that "we must accept the facts pleaded as true and construe them in a light favorable to plaintiffs").

Nor are Covad's price squeezing claims barred by Trinko's discussion of the FTCA's regulatory priority over antitrust law enforcement. See Trinko, 124 S.Ct. at 882 (finding the FTCA regime to be "an effective steward of the antitrust function"). The Trinko Court observed that federal courts are ill-equipped to manage the complicated disputes over §251(c)(3) duties that frequently arise out of telecom interconnection agreements. Id. at 882-83 (finding that the costs of antitrust intervention in this context exceed the benefits and stating that "[a]n antitrust court is unlikely to be an effective day-to-day enforcer of [the FTCA's] detailed sharing obligations"). Instead, courts should defer to the FTCA's preexisting regulatory framework rather than try to adjudicate complex Sherman Act lawsuits in the telecommunications area.

Here, we find that Covad's price squeezing claims depend upon Covad's

FTCA-mandated interconnection agreement with BellSouth only in a circular sense. Covad alleges that the wholesale prices BellSouth charges ISPs for DSL service, and the retail prices it charges individual customers for combined DSL and Internet access service, are significantly lower than the unbundled wholesale loop prices BellSouth charges Covad and other CLECs pursuant to the interconnection agreement. If it is true that the wholesale prices BellSouth is charging ISPs for DSL service, and the retail prices it is charging individual customers for combined DSL and Internet service, are "below an appropriate measure of [BellSouth's] costs," Brooke Group, 509 U.S. at 222, that fact suffices to satisfy the first prong of a price predation offense under § 2 of the Sherman Act. As noted above, whether the unbundled wholesale loop prices BellSouth charges Covad pursuant to the interconnection agreement are the "appropriate measure of [BellSouth's] costs" is a matter for the trier of fact to determine. That these two measures may be the same does not somehow immunize BellSouth from the application of traditional antitrust principles. The unbundled wholesale loop prices that BellSouth charges Covad are made available to Covad pursuant to § 251(c)(3) and § 252 of the FTCA. Section 251(c)(3) requires BellSouth

> to provide . . . nondiscriminatory access to network elements on an
> unbundled basis . . . on rates . . . that are just, reasonable, and
> nondiscriminatory in accordance with . . . this section and section 252

15

of this title.

Section 252(d)(1), in turn, provides that

> [d]eterminations by a State commission of the just and reasonable rate for . . . network elements for purposes of subsection (c)(3) of [section 251] shall be based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the . . . network element . . . and nondiscriminatory, and may include a reasonable profit.

As this language makes clear, the FTCA employs the same baseline standard – namely, "cost" – for determining the validity of an ILEC's prices as does the Brooke Group antitrust test of price predation, which asks whether "the prices complained of are below an appropriate measure of its rival's costs." Brooke Group, 509 U.S. at 222. Thus, the at-cost measure that Covad invokes for purposes of stating a predatory pricing claim is tied to the FTCA only in a very formal, circular sense. To say that Covad's price squeezing claim defines the "appropriate measure of [BellSouth's] costs," id., in terms of an obligation created by the FTCA is to say very little when the FTCA itself relies upon "cost" as the appropriate measure by which to determine interconnection and network element rates. We conclude that Covad's price squeezing claim is based on traditional antitrust standards. As the Trinko Court noted, while the FTCA "does not create new claims that go beyond existing antitrust standards," it also "preserves claims

16

that satisfy existing antitrust standards." Trinko, 124 S.Ct. at 878. Our responsibility under Trinko to harmonize the Sherman Act and the FTCA does not entail excluding facially valid antitrust claims at the pleadings stage.[7]

We turn next to Covad's FTCA and state law breach of contract causes of action. Neither of these is affected by the Trinko decision. As noted earlier, the district court dismissed these claims on the ground that they must first be brought before a state PSC. In our initial opinion in this case, we reversed the trial court's dismissal in light of our holding in MCIMetro I, 278 F.3d at 1237 (holding that state PSCs are not authorized by § 252 of the FTCA to interpret interconnection agreements). In a subsequent en banc opinion, however, we overturned this judgment and held that state PSCs do have jurisdiction to adjudicate disputes over and interpret the terms of FTCA-mandated interconnection agreements. MCIMetro II, 317 F.3d 1270. Covad may now bring those claims before the relevant state PSCs, and judicial review of state PSC determinations is available in the federal courts pursuant to 47 U.S.C. § 252(e)(6). Accordingly, we now affirm

---

[7] It is true that the same set of facts that Covad cites in support of its price squeezing claim might also be actionable under the FTCA. If BellSouth has sold (or is now selling) wholesale DSL service to ISPs at prices lower than those it charges Covad, as Covad alleges, BellSouth may well have violated the § 252(d)(1) requirement of "nondiscriminatory" pricing for unbundled network elements. But such a claim – which Covad has not made in this case – would involve a dispute over the terms of the FTCA-mandated interconnection agreement between BellSouth and Covad. As we explain below, pursuant to MCIMetro II, a claim directly under the FTCA must be brought in the first instance before the relevant state PSCs.

17

the trial court's dismissal of Covad's FTCA and state law breach of contract causes of action.

Finally, we find that Covad's state law claims for tortious interference with business relations are wholly untouched by Trinko. These claims do not implicate any obligations arising under Covad's interconnection agreement with BellSouth, and so Covad may proceed with those claims after Trinko as before.

To summarize, in light of Trinko we now affirm the district court's dismissal of Covad's refusal to deal and essential facilities claims. In light of MCIMetro II, we now also affirm the district court's dismissal of Covad's FTCA and state law breach of contract claims. As in our earlier opinion, however, we reverse the district court's dismissal of Covad's price squeezing and tortious interference with business relations claims. This case is now remanded to the district court for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.