(Slip Opinion) OCTOBER TERM, 2008 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PACIFIC BELL TELEPHONE CO., DBA AT&T CALI-FORNIA, ET AL. *v.* LINKLINE COMMUNICATIONS, INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 07–512.　Argued December 8, 2008—Decided February 25, 2009

Petitioners (hereinafter AT&T) own infrastructure and facilities needed to provide "DSL" service, a method of connecting to the Internet at high speeds over telephone lines. As a condition for a recent merger, the Federal Communications Commission requires AT&T to provide wholesale DSL transport service to independent firms at a price no greater than the retail price of AT&T's DSL service. The plaintiffs in this case, respondents here, are independent Internet service providers that compete with AT&T in the retail DSL market in California. The plaintiffs do not own all the facilities needed to supply DSL service, and must lease wholesale DSL transport service from AT&T. They filed suit under §2 of the Sherman Act, asserting that AT&T unlawfully "squeezed" their profit margins by setting a high price for the wholesale DSL transport service it sells and a low price for its own retail DSL service. This maneuver allegedly placed the plaintiffs at a competitive disadvantage, allowing AT&T to maintain monopoly power in the DSL market. AT&T moved for judgment on the pleadings, arguing that the plaintiffs' claims were foreclosed by *Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP,* 540 U. S. 398, 410, in which this Court held that a firm with no antitrust duty to deal with its rivals has no obligation to provide those rivals with a "sufficient" level of service. The District Court found that AT&T had no antitrust duty to deal with the plaintiffs, but nonetheless denied the motion, holding that *Trinko* did not address price-squeeze claims. The court certified its order for interlocutory appeal on the question whether *Trinko* bars price-squeeze claims when the parties are required to deal by federal communications law, but not

antitrust law.  The Ninth Circuit affirmed, holding that *Trinko* did
not address the viability of price-squeeze claims, and thus the plain-
tiffs' complaint stated a potentially valid §2 claim.

*Held:*

  1. The case is not moot.  The plaintiffs now agree that their claims
must meet the *Brooke Group* test for predatory pricing, apparently
apart from their price-squeeze theory.  That test established two re-
quirements for predatory pricing: below-cost retail pricing and a
"'dangerous probability'" that the defendant will recoup any lost
profits, see *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*,
509 U. S. 209, 222–224.  Despite the plaintiffs' new position, the par-
ties continue to seek different relief: AT&T seeks reversal of the deci-
sion below and dismissal of the complaint, while the plaintiffs seek
leave to amend their complaint to allege a *Brooke Group* claim.  It is
also not clear that the plaintiffs have unequivocally abandoned their
price-squeeze claims.  Prudential concerns favor answering the ques-
tion presented; absent a decision on the merits, the Circuit conflict
that this Court granted certiorari to resolve would persist.  Pp. 5–7.

  2. A price-squeeze claim may not be brought under §2 when the de-
fendant has no antitrust duty to deal with the plaintiff at wholesale.
Pp. 7–17.

    (a) Businesses are generally free to choose the parties with whom
they will deal, as well as the prices, terms, and conditions of that
dealing.  See *United States* v. *Colgate & Co.*, 250 U. S. 300, 307.  But
in rare circumstances, a dominant firm may incur antitrust liability
for purely unilateral conduct, such as charging "predatory" prices.
*Brooke Group, supra,* at 222–224.  There are also limited circum-
stances in which a firm's unilateral refusal to deal with its rivals can
give rise to antitrust liability.  See *Aspen Skiing Co.* v. *Aspen High-
lands Skiing Corp.*, 472 U. S. 585, 608–611.  Here, plaintiffs do not
allege predatory pricing, and the District Court concluded that there
was no antitrust duty to deal.  Plaintiffs challenge a different type of
unilateral conduct in which a firm "squeezes" its competitors' profit
margins.  This requires the defendant to operate in both the whole-
sale ("upstream") and retail ("downstream") markets.  By raising the
wholesale price of inputs while cutting its own retail prices, the de-
fendant can raise competitors' costs while putting downward pres-
sure on their revenues.  Price-squeeze plaintiffs assert that defen-
dants must leave them a "fair" or "adequate" margin between
wholesale and retail prices.  Pp. 7–9.

    (b) Where there is no duty to deal at the wholesale level and no
predatory pricing at the retail level, a firm is not required to price
both of these services in a manner that preserves its rivals' profit
margins.  Pp. 9–12.

Syllabus

(1) Any challenge to AT&T's *wholesale* prices is foreclosed by a straightforward application of *Trinko*. The claim in *Trinko* addressed the quality of Verizon's support services, while the claims in this case challenge AT&T's pricing structure. But for antitrust purposes, there is no meaningful distinction between price and nonprice components of a transaction. The nub of the complaint in both cases is identical— the plaintiffs alleged that the defendants (upstream monopolists) abused their power in the wholesale market to prevent rival firms from competing effectively in the retail market. But a firm with no antitrust duty to deal in the wholesale market has no obligation to deal under terms and conditions favorable to its competitors. See *Trinko, supra,* at 410. Had AT&T simply stopped providing DSL transport service to the plaintiffs, it would not have run afoul of the Sherman Act. Thus, it was not required to offer this service at the wholesale prices the plaintiffs would have preferred. Pp. 9–10.

(2) The other component of a price-squeeze claim is the assertion that the defendant's *retail* prices are "too low." Here too plaintiffs' claims find no support in existing antitrust doctrine. "[C]utting prices in order to increase business often is the very essence of competition." *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 594. To avoid chilling aggressive price competition, the Court has carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that the defendant's prices are too low. See *Brooke Group, supra,* at 222–224. The complaint at issue here has no allegation that AT&T's conduct met either *Brooke Group* requirement. Recognizing a price-squeeze claim where the defendant's retail price remains above cost would invite the precise harm the Court sought to avoid in *Brooke Group*: Firms might raise retail prices or refrain from aggressive price competition to avoid potential antitrust liability. See 509 U. S., at 223. Pp. 11–12.

(c) Institutional concerns also counsel against recognizing such claims. This Court has repeatedly emphasized the importance of clear rules in antitrust law. Recognizing price-squeeze claims would require courts simultaneously to police both the wholesale and retail prices to ensure that rival firms are not being squeezed. Courts would be aiming at a moving target, since it is the *interaction* between these two prices that may result in a squeeze. Moreover, firms seeking to avoid price-squeeze liability will have no safe harbor for their pricing practices. The most commonly articulated standard for price squeezes is that the defendant must leave its rivals a "fair" or "adequate" margin between wholesale and retail prices; this test is nearly impossible for courts to apply without conducting complex proceedings like rate-setting agencies. Some amici argue that a price squeeze should be presumed if the defendant's wholesale price ex-

Syllabus

ceeds its retail price.  But if both the wholesale price and the retail price are independently lawful, there is no basis for imposing antitrust liability simply because a vertically integrated firm's wholesale price is greater than or equal to its retail price.  Pp. 12–15.

     (d) The District Court on remand should consider whether an amended complaint filed by the plaintiffs states a claim upon which relief may be granted under the pleading standard articulated in *Bell Atlantic Corp.* v. *Twombly*, 550 U. S. 544, 561–563; whether plaintiffs should be given leave to amend their complaint to bring a *Brooke Group* claim; and such other matters properly before it.  Pp. 15–17.

503 F. 3d 876, reversed and remanded.

    ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined.  BREYER, J., filed an opinion concurring in the judgment, in which STEVENS, SOUTER, and GINSBURG, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–512

PACIFIC BELL TELEPHONE COMPANY, DBA AT&T
CALIFORNIA, ET AL., PETITIONERS *v.* LINKLINE
COMMUNICATIONS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[February 25, 2009]

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

The plaintiffs in this case, respondents here, allege that
a competitor subjected them to a "price squeeze" in viola-
tion of §2 of the Sherman Act. They assert that such a
claim can arise when a vertically integrated firm sells
inputs at wholesale and also sells finished goods or ser-
vices at retail. If that firm has power in the wholesale
market, it can simultaneously raise the wholesale price of
inputs and cut the retail price of the finished good. This
will have the effect of "squeezing" the profit margins of
any competitors in the retail market. Those firms will
have to pay more for the inputs they need; at the same
time, they will have to cut their retail prices to match the
other firm's prices. The question before us is whether
such a price-squeeze claim may be brought under §2 of the
Sherman Act when the defendant is under no antitrust
obligation to sell the inputs to the plaintiff in the first
place. We hold that no such claim may be brought.

I

This case involves the market for digital subscriber line (DSL) service, which is a method of connecting to the Internet at high speeds over telephone lines. AT&T[1] owns much of the infrastructure and facilities needed to provide DSL service in California. In particular, AT&T controls most of what is known as the "last mile"—the lines that connect homes and businesses to the telephone network. Competing DSL providers must generally obtain access to AT&T's facilities in order to serve their customers.

Until recently, the Federal Communications Commission (FCC) required incumbent phone companies such as AT&T to sell transmission service to independent DSL providers, under the theory that this would spur competition. See *In re Appropriate Framework for Broadband Access to Internet over Wireline Facilities*, 20 FCC Rcd. 14853, 14868 (2005). In 2005, the Commission largely abandoned this forced-sharing requirement in light of the emergence of a competitive market beyond DSL for high-speed Internet service; DSL now faces robust competition from cable companies and wireless and satellite services. *Id.*, at 14879–14887. As a condition for a recent merger, however, AT&T remains bound by the mandatory interconnection requirements, and is obligated to provide wholesale "DSL transport" service to independent firms at a price no greater than the retail price of AT&T's DSL service. *In re AT&T Inc. and BellSouth Corp.*, 22 FCC Rcd. 5662, 5814 (2007).

The plaintiffs are four independent Internet service providers (ISPs) that compete with AT&T in the retail DSL market. Plaintiffs do not own all the facilities needed

---

[1] Petitioners consist of several corporate entities and subsidiaries, and their names and corporate structures have changed frequently over the course of this litigation. For simplicity, we will refer to all the petitioners as "AT&T."

to supply their customers with this service. They instead lease DSL transport service from AT&T pursuant to the merger conditions described above. AT&T thus participates in the DSL market at both the wholesale and retail levels; it provides plaintiffs and other independent ISPs with wholesale DSL transport service, and it also sells DSL service directly to consumers at retail.

In July 2003, the plaintiffs brought suit in District Court, alleging that AT&T violated §2 of the Sherman Act, 15 U. S. C. §2, by monopolizing the DSL market in California. The complaint alleges that AT&T refused to deal with the plaintiffs, denied the plaintiffs access to essential facilities, and engaged in a "price squeeze." App. 18–19. Specifically, plaintiffs contend that AT&T squeezed their profit margins by setting a high wholesale price for DSL transport and a low retail price for DSL Internet service. This maneuver allegedly "exclude[d] and unreasonably impede[d] competition," thus allowing AT&T to "preserve and maintain its monopoly control of DSL access to the Internet." *Ibid.*

In *Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U. S. 398, 410 (2004), we held that a firm with no antitrust duty to deal with its rivals at all is under no obligation to provide those rivals with a "sufficient" level of service. Shortly after we issued that decision, AT&T moved for judgment on the pleadings, arguing that the plaintiffs' claims in this case were foreclosed by *Trinko*. The District Court held that AT&T had no antitrust duty to deal with the plaintiffs, App. to Pet. for Cert. 77a–85a, but it denied the motion to dismiss with respect to the price-squeeze claims, *id.*, at 86a–90a. The court acknowledged that AT&T's argument "has a certain logic to it," but held that *Trinko* "simply does not involve price-squeeze claims." *Id.*, at 86a. The District Court also noted that price-squeeze claims have been recognized by several Circuits and "are cognizable under existing antitrust

standards." *Id.*, at 89a, and n. 27.

At the District Court's request, plaintiffs then filed an amended complaint providing greater detail about their price-squeeze claims. AT&T again moved to dismiss, arguing that price-squeeze claims could only proceed if they met the two established requirements for predatory pricing: below-cost retail pricing and a "'dangerous probability'" that the defendant will recoup any lost profits. See *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U. S. 209, 222–224 (1993). The District Court did not reach the issue whether *all* price-squeeze claims must meet the *Brooke Group* requirements, because it concluded that the amended complaint, "generously construed," satisfied those criteria. App. to Pet. for Cert. 46a–49a, 56a. The court also certified its earlier order for interlocutory appeal on the question whether "*Trinko* bars price squeeze claims where the parties are compelled to deal under the federal communications laws." *Id.*, at 56a–57a.

On interlocutory appeal, the Court of Appeals for the Ninth Circuit affirmed the District Court's denial of AT&T's motion for judgment on the pleadings on the price-squeeze claims. 503 F. 3d 876 (2007). The court emphasized that "*Trinko* did not involve a price squeezing theory." *Id.*, at 883. Because "a price squeeze theory formed part of the fabric of traditional antitrust law prior to *Trinko*," the Court of Appeals concluded that "those claims should remain viable notwithstanding either the telecommunications statutes or *Trinko*." *Ibid.* Based on the record before it, the court held that plaintiffs' original complaint stated a potentially valid claim under §2 of the Sherman Act.

Judge Gould dissented, noting that "the notion of a 'price squeeze' is itself in a squeeze between two recent Supreme Court precedents." *Id.*, at 886. A price-squeeze claim involves allegations of both a high wholesale price

and a low retail price, so Judge Gould analyzed each component separately. He concluded that "*Trinko* insulates from antitrust review the setting of the upstream price." *Id.*, at 886–887. With respect to the downstream price, he argued that "the retail side of a price squeeze cannot be considered to create an antitrust violation if the retail pricing does not satisfy the requirements of *Brooke Group*, which set unmistakable limits on what can be considered to be predatory within the meaning of the antitrust laws." *Id.*, at 887 (citing *Brooke Group*, *supra*, at 222–224). Judge Gould concluded that the plaintiffs' complaint did not satisfy these requirements because it contained no allegations that the retail price was set below cost and that those losses could later be recouped. 503 F. 3d, at 887. Judge Gould would have allowed the plaintiffs to amend their complaint if they could, in good faith, raise predatory pricing claims meeting the *Brooke Group* requirements. *Ibid.*

We granted certiorari, 554 U. S. \_\_\_ (2008), to resolve a conflict over whether a plaintiff can bring price-squeeze claims under §2 of the Sherman Act when the defendant has no antitrust duty to deal with the plaintiff. See *Covad Communications Co.* v. *Bell Atlantic Co.*, 398 F. 3d 666, 673–674 (CADC 2005) (holding that *Trinko* bars such claims). We reverse.

## II

This case has assumed an unusual posture. The plaintiffs now assert that they agree with Judge Gould's dissenting position that price-squeeze claims must meet the *Brooke Group* requirements for predatory pricing. They ask us to vacate the decision below in their favor and remand with instructions that they be given leave to amend their complaint to allege a *Brooke Group* claim. In other words, plaintiffs are no longer pleased with their initial theory of the case, and ask for a mulligan to try

again under a different theory.  Some amici argue that the case is moot in light of this confession of error.  They contend that "[w]ith both petitioners and respondents now aligned on [the same] side of the question presented, *no party* with a concrete stake in this case's outcome is advocating for the contrary position."  Brief for COMPTEL 6.

We do not think this case is moot.  First, the parties continue to seek different relief.  AT&T asks us to reverse the judgment of the Court of Appeals and remand with instructions to dismiss the complaint at issue.  The plaintiffs ask that we vacate the judgment and remand with instructions that they be given leave to amend their complaint.  The parties thus continue to be adverse not only in the litigation as a whole, but in the specific proceedings before this Court.

Second, it is not clear that the plaintiffs have unequivocally abandoned their price-squeeze claims.  In their brief and at oral argument, the plaintiffs continue to refer to their "pricing squeeze claim."  See Brief for Respondents 13.  They appear to acknowledge that those claims must meet the *Brooke Group* requirements, but it is not clear whether they believe the necessary showing can be made in at least partial reliance on the sort of price squeeze theory accepted by the Court of Appeals.  At one point, for example, the plaintiffs suggest that "the DSL transport price" may be pertinent to their claims going forward under the theory of Judge Gould's dissent; that opinion, however, concluded that *Trinko* "in essence takes the issu[e] of wholesale pricing out of the case."  503 F. 3d, at 886.  Given this ambiguity, the case before us remains a live dispute appropriate for decision.  Cf. *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 189 (2000) (a party's voluntary conduct renders a case moot only if it is "'absolutely clear'" the party will take that course of action).

Amici also argue that we should dismiss the writ of

certiorari because of the "lack of adversarial presentation" by an interested party. Brief for COMPTEL 7. To the contrary, prudential concerns favor our answering the question presented. Plaintiffs defended the Court of Appeals' decision at the certiorari stage, and the parties have invested a substantial amount of time, effort, and resources in briefing and arguing the merits of this case. In the absence of a decision from this Court on the merits, the Court of Appeals' decision would presumably remain binding precedent in the Ninth Circuit, and the Circuit conflict we granted certiorari to resolve would persist. Two amici have submitted briefs defending the Court of Appeals' decision on the merits, and we granted the motion of one of those amici to participate in oral argument. 555 U. S. \_\_\_ (2008). We think it appropriate to proceed to address the question presented.

## III
### A

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U. S. C. §2. Simply possessing monopoly power and charging monopoly prices does not violate §2; rather, the statute targets "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States* v. *Grinnell Corp.*, 384 U. S. 563, 570–571 (1966).

As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing. See *United States* v. *Colgate & Co.*, 250 U. S. 300, 307 (1919). But there are rare instances in which a dominant firm may incur anti-

trust liability for purely unilateral conduct.  For example, we have ruled that firms may not charge "predatory" prices—below-cost prices that drive rivals out of the market and allow the monopolist to raise its prices later and recoup its losses.  *Brooke Group,* 509 U. S., at 222–224.  Here, however, the complaint at issue does not contain allegations meeting those requirements.  App. 10–24.

There are also limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability.  See *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U. S. 585, 608–611 (1985).  Here, however, the District Court held that AT&T had no such antitrust duty to deal with its competitors, App. to Pet. for Cert. 84a–85a, and this holding was not challenged on appeal.[2]

The challenge here focuses on retail prices—where there is no predatory pricing—and the terms of dealing—where there is no duty to deal.  Plaintiffs' price-squeeze claims challenge a different type of unilateral conduct in which a firm "squeezes" the profit margins of its competitors.  This requires the defendant to be operating in two markets, a wholesale ("upstream") market and a retail ("downstream") market.  A firm with market power in the upstream market can squeeze its downstream competitors by raising the wholesale price of inputs while cutting its own retail prices.  This will raise competitors' costs (because they will have to pay more for their inputs) and lower

————————

[2] The Court of Appeals assumed that any duty to deal arose only from FCC regulations, 503 F. 3d, at 878–879, n. 6, and the question on which we granted certiorari made the same assumption.  Even aside from the District Court's reasoning, App. to Pet. for Cert. 77a–85a, it seems quite unlikely that AT&T would have an antitrust duty to deal with the plaintiffs.  Such a duty requires a showing of monopoly power, but—as the FCC has recognized, 20 FCC Rcd., at 14879–14887—the market for high-speed Internet service is now quite competitive; DSL providers face stiff competition from cable companies and wireless and satellite providers.

their revenues (because they will have to match the dominant firm's low retail price). Price-squeeze plaintiffs assert that defendants must leave them a "fair" or "adequate" margin between the wholesale price and the retail price. In this case, we consider whether a plaintiff can state a price-squeeze claim when the defendant has no obligation under the antitrust laws to deal with the plaintiff at wholesale.

### B

1. A straightforward application of our recent decision in *Trinko* forecloses any challenge to AT&T's *wholesale* prices. In *Trinko*, Verizon was required by statute to lease its network elements to competing firms at wholesale rates. 540 U. S., at 402–403. The plaintiff—a customer of one of Verizon's rivals—asserted that Verizon denied its competitors access to interconnection support services, making it difficult for those competitors to fill their customers' orders. *Id.*, at 404–405. The complaint alleged that this conduct in the upstream market violated §2 of the Sherman Act by impeding the ability of independent carriers to compete in the downstream market for local telephone service. *Ibid.*

We held that the plaintiff's claims were not actionable under §2. Given that Verizon had no antitrust duty to deal with its rivals at all, we concluded that "Verizon's alleged insufficient assistance in the provision of service to rivals" did not violate the Sherman Act. *Id.*, at 410. *Trinko* thus makes clear that if a firm has no antitrust duty to deal with its competitors at wholesale, it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous.

In this case, as in *Trinko*, the defendant has no antitrust duty to deal with its rivals at wholesale; any such duty arises only from FCC regulations, not from the Sherman Act. See *supra*, at 8. There is no meaningful distinction

between the "insufficient assistance" claims we rejected in *Trinko* and the plaintiffs' price-squeeze claims in the instant case. The *Trinko* plaintiffs challenged the quality of Verizon's interconnection service, while this case involves a challenge to AT&T's pricing structure. But for antitrust purposes, there is no reason to distinguish between price and nonprice components of a transaction. See, *e.g.*, *American Telephone & Telegraph Co.* v. *Central Office Telephone, Inc.*, 524 U. S. 214, 223 (1998) ("Any claim for excessive rates can be couched as a claim for inadequate services and vice versa"). The nub of the complaint in both *Trinko* and this case is identical—the plaintiffs alleged that the defendants (upstream monopolists) abused their power in the wholesale market to prevent rival firms from competing effectively in the retail market. *Trinko* holds that such claims are not cognizable under the Sherman Act in the absence of an antitrust duty to deal.

The District Court and the Court of Appeals did not regard *Trinko* as controlling because that case did not directly address price-squeeze claims. 503 F. 3d, at 883; App. to Pet. for Cert. 86a; see also Brief for COMPTEL 27–30. This is technically true, but the reasoning of *Trinko* applies with equal force to price-squeeze claims. AT&T could have squeezed its competitors' profits just as effectively by providing poor-quality interconnection service to the plaintiffs, as Verizon allegedly did in *Trinko*. But a firm with no duty to deal in the wholesale market has no obligation to deal under terms and conditions favorable to its competitors. If AT&T had simply stopped providing DSL transport service to the plaintiffs, it would not have run afoul of the Sherman Act. Under these circumstances, AT&T was not required to offer this service at the wholesale prices the plaintiffs would have preferred.

2. The other component of a price-squeeze claim is the assertion that the defendant's *retail* prices are "too low."

Here too plaintiffs' claims find no support in our existing antitrust doctrine.

"[C]utting prices in order to increase business often is the very essence of competition." *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 594 (1986). In cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are "especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Ibid.*; see also *Brooke Group*, 509 U. S., at 226; *Cargill, Inc.* v. *Monfort of Colo., Inc.*, 479 U. S. 104, 121–122, n. 17 (1986). To avoid chilling aggressive price competition, we have carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low. Specifically, to prevail on a predatory pricing claim, a plaintiff must demonstrate that: (1) "the prices complained of are below an appropriate measure of its rival's costs"; and (2) there is a "dangerous probability" that the defendant will be able to recoup its "investment" in below-cost prices. *Brooke Group*, *supra*, at 222–224. "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atlantic Richfield Co.* v. *USA Petroleum Co.*, 495 U. S. 328, 340 (1990).

In the complaint at issue in this interlocutory appeal, App. 10–24, there is no allegation that AT&T's conduct met either of the *Brooke Group* requirements. Recognizing a price-squeeze claim where the defendant's retail price remains above cost would invite the precise harm we sought to avoid in *Brooke Group*: Firms might raise their retail prices or refrain from aggressive price competition to avoid potential antitrust liability. See 509 U. S., at 223 ("As a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of

a judicial tribunal to control without courting intolerable risks of chilling legitimate price cutting").

3. Plaintiffs' price-squeeze claim, looking to the relation between retail and wholesale prices, is thus nothing more than an amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level. If there is no duty to deal at the wholesale level and no predatory pricing at the retail level, then a firm is certainly not required to price *both* of these services in a manner that preserves its rivals' profit margins.[3]

C

1. Institutional concerns also counsel against recognition of such claims. We have repeatedly emphasized the importance of clear rules in antitrust law. Courts are ill suited "to act as central planners, identifying the proper price, quantity, and other terms of dealing." *Trinko*, 540 U. S., at 408. "'No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise. The problem should be deemed irremedia[ble] by antitrust law when compulsory access requires the court to assume the day-to-day controls characteristic of a regulatory agency.'" *Id.*, at 415 (quoting Areeda, Essential Facilities: An Epithet in Need of Limiting Principles, 58 Antitrust

---

[3] Like the Court of Appeals, 503 F. 3d, at 880, amici argue that price-squeeze claims have been recognized by Circuit Courts for many years, beginning with Judge Hand's opinion in *United States* v. *Aluminum Co. of America*, 148 F. 2d 416 (CA2 1945) (*Alcoa*). In that case, the Government alleged that Alcoa was using its monopoly power in the upstream aluminum ingot market to squeeze the profits of downstream aluminum sheet fabricators. The court concluded: "That it was unlawful to set the price of 'sheet' so low and hold the price of ingot so high, seems to us unquestionable, provided, as we have held, that on this record the price of ingot must be regarded as higher than a 'fair price.'" *Id.*, at 438. Given developments in economic theory and antitrust jurisprudence since *Alcoa*, we find our recent decisions in *Trinko* and *Brooke Group* more pertinent to the question before us.

L. J. 841, 853 (1989)); see also *Town of Concord* v. *Boston Edison Co.*, 915 F. 2d 17, 25 (CA1 1990) (Breyer, C. J.) ("[A]ntitrust courts normally avoid direct price administration, relying on rules and remedies . . . that are easier to administer").

It is difficult enough for courts to identify and remedy an alleged anticompetitive practice at one level, such as predatory pricing in retail markets or a violation of the duty-to-deal doctrine at the wholesale level. See *Brooke Group*, *supra*, at 225 (predation claims "requir[e] an understanding of the extent and duration of the alleged predation, the relative financial strength of the predator and its intended victim, and their respective incentives and will"); *Trinko*, *supra*, at 408. Recognizing price-squeeze claims would require courts simultaneously to police both the wholesale and retail prices to ensure that rival firms are not being squeezed. And courts would be aiming at a moving target, since it is the *interaction* between these two prices that may result in a squeeze.

Perhaps most troubling, firms that seek to avoid price-squeeze liability will have no safe harbor for their pricing practices. See *Town of Concord*, *supra*, at 22 (antitrust rules "must be clear enough for lawyers to explain them to clients"). At least in the predatory pricing context, firms know they will not incur liability as long as their retail prices are above cost. *Brooke Group*, *supra*, at 223. No such guidance is available for price-squeeze claims. See, *e.g.*, 3B P. Areeda & H. Hovenkamp, Antitrust Law ¶767c, p. 138 (3d ed. 2008) ("[A]ntitrust faces a severe problem not only in recognizing any §2 [price-squeeze] offense, but also in formulating a suitable remedy").

The most commonly articulated standard for price squeezes is that the defendant must leave its rivals a "fair" or "adequate" margin between the wholesale price and the retail price. See *Town of Concord*, *supra*, at 23–25; *Alcoa*, 148 F. 2d 416, 437–438 (CA2 1945). One of our

colleagues has highlighted the flaws of this test in Socratic fashion:

> "[H]ow is a judge or jury to determine a 'fair price?' Is it the price charged by other suppliers of the primary product? None exist. Is it the price that competition 'would have set' were the primary level not monopolized? How can the court determine this price without examining costs and demands, indeed without acting like a rate-setting regulatory agency, the rate-setting proceedings of which often last for several years? Further, how is the court to decide the proper size of the price 'gap?' Must it be large enough for all independent competing firms to make a 'living profit,' no matter how inefficient they may be? . . . And how should the court respond when costs or demands change over time, as they inevitably will?" *Town of Concord*, *supra*, at 25.

Some amici respond to these concerns by proposing a "transfer price test" for identifying an unlawful price squeeze: A price squeeze should be presumed if the upstream monopolist could not have made a profit by selling at its retail rates if it purchased inputs at its own wholesale rates. Brief for American Antitrust Institute (AAI) 30; Brief for COMPTEL 16–19; see *Ray* v. *Indiana & Mich. Elec. Co.*, 606 F. Supp. 757, 776–777 (ND Ill. 1984). Whether or not that test is administrable, it lacks any grounding in our antitrust jurisprudence. An upstream monopolist with no duty to deal is free to charge whatever wholesale price it would like; antitrust law does not forbid lawfully obtained monopolies from charging monopoly prices. *Trinko*, *supra*, at 407 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system"). Similarly, the Sherman Act does not forbid—indeed, it *encourages*—

aggressive price competition at the retail level, as long as the prices being charged are not predatory. *Brooke Group*, 509 U. S., at 223–224. If both the wholesale price and the retail price are independently lawful, there is no basis for imposing antitrust liability simply because a vertically integrated firm's wholesale price happens to be greater than or equal to its retail price.

2. Amici assert that there are circumstances in which price squeezes may harm competition. For example, they assert that price squeezes may raise entry barriers that fortify the upstream monopolist's position; they also contend that price squeezes may impair nonprice competition and innovation in the downstream market by driving independent firms out of business. See Brief for AAI 11–15; *Town of Concord*, *supra,* at 23–24.

The problem, however, is that amici have not identified any independent competitive harm caused by price squeezes above and beyond the harm that would result from a duty-to-deal violation at the wholesale level or predatory pricing at the retail level. See 3A P. Areeda & H. Hovenkamp, Antitrust Law ¶767c, p. 126 (2d ed. 2002) ("[I]t is difficult to see any *competitive* significance [of a price squeeze] apart from the consequences of vertical integration itself"). To the extent a monopolist violates one of these doctrines, the plaintiffs have a remedy under existing law. We do not need to endorse a new theory of liability to prevent such harm.

## IV

Lastly, as mentioned above, plaintiffs have asked us for leave to amend their complaint to bring a *Brooke Group* predatory pricing claim. We need not decide whether leave to amend should be granted. Our grant of certiorari was limited to the question whether price-squeeze claims are cognizable in the absence of an antitrust duty to deal. The Court of Appeals addressed only AT&T's motion for

judgment on the pleadings on the plaintiffs' *original* com-
plaint.[4]    For the reasons stated, we hold that the price-
squeeze claims set forth in that complaint are not cogniza-
ble under the Sherman Act.

Plaintiffs have also filed an amended complaint, and the
District Court concluded that this complaint, generously
construed, could be read as alleging conduct that met the
*Brooke Group* requirements for predatory pricing.  App. to
Pet. for Cert. 47a–52a, 56a.  That order, however, applied
the "no set of facts" pleading standard that we have since
rejected as too lenient.    See *Bell Atlantic Corp.* v.
*Twombly*, 550 U. S. 544, 561–563 (2007).    It is for the
District Court on remand to consider whether the
amended complaint states a claim upon which relief may
be granted in light of the new pleading standard we ar-
ticulated in *Twombly*, whether plaintiffs should be given
leave to amend their complaint to bring a claim under
*Brooke Group*, and such other matters properly before it.
Even if the amended complaint is further amended to add
a *Brooke Group* claim, it may not survive a motion to
dismiss.  For if AT&T can bankrupt the plaintiffs by refus-
ing to deal altogether, the plaintiffs must demonstrate

---

[4]We note a procedural irregularity with this case: Normally, an
amended complaint supersedes the original complaint.  See 6 C. Wright
& A. Miller, Federal Practice & Procedure §1476, pp. 556–557 (2d ed.
1990).  Here, the District Court addressed the amended complaint in its
2005 order, App. to Pet. for Cert. 36a–52a, but the court only certified
its 2004 order—addressing the *original* complaint—for interlocutory
appeal, *id.*, at 56a–57a.  Both parties, as well as the Solicitor General,
have expressed confusion about whether the amended complaint and
the 2005 order are properly before this Court.  See Brief for Petitioners
9, n. 6 (noting "some ambiguity" about which order was certified); Brief
for United States 17 ("[I]t is unclear whether the 2005 Order and the
amended complaint are properly at issue in this interlocutory appeal");
Brief for Respondents 8–10.  The Court of Appeals majority did not
address any of the District Court's holdings from the 2005 order, so we
decline to consider those issues at this time.

why the law prevents AT&T from putting them out of business by pricing them out of the market. Nevertheless, such questions are for the District Court to decide in the first instance. We do not address these issues here, as they are outside the scope of the question presented and were not addressed by the Court of Appeals in the decision below. See *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005) ("[W]e are a court of review, not of first view").

\*    \*    \*

*Trinko* holds that a defendant with no antitrust duty to deal with its rivals has no duty to deal under the terms and conditions preferred by those rivals. 540 U. S., at 409–410. *Brooke Group* holds that low prices are only actionable under the Sherman Act when the prices are below cost and there is a dangerous probability that the predator will be able to recoup the profits it loses from the low prices. 509 U. S., at 222–224. In this case, plaintiffs have not stated a duty-to-deal claim under *Trinko* and have not stated a predatory pricing claim under *Brooke Group*. They have nonetheless tried to join a wholesale claim that cannot succeed with a retail claim that cannot succeed, and alchemize them into a new form of antitrust liability never before recognized by this Court. We decline the invitation to recognize such claims. Two wrong claims do not make one that is right.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 07–512

PACIFIC BELL TELEPHONE COMPANY, DBA AT&T CALIFORNIA, ET AL., PETITIONERS *v.* LINKLINE COMMUNICATIONS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[February 25, 2009]

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, concurring in the judgment.

I would accept respondents' concession that the Ninth Circuit majority's "price squeeze" holding is wrong, I would vacate the Circuit's decision, and I would remand the case in order to allow the District Court to determine whether respondents may proceed with their "predatory pricing" claim as set forth in Judge Gould's dissenting Ninth Circuit opinion. *linkLine Communications, Inc.* v. *SBC California, Inc.*, 503 F. 3d 876, 887 (2007).

A "price squeeze" claim finds its natural home in a Sherman Act §2 monopolization case where the Government as plaintiff seeks to show that a defendant's monopoly power rests, not upon "skill, foresight and industry," *United States* v. *Aluminum Co. of America*, 148 F. 2d 416, 430 (CA2 1945) *(Alcoa)*, but upon exclusionary conduct, *United States* v. *Grinnell Corp.*, 384 U. S. 563, 576 (1966). As this Court pointed out in *Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U. S. 398 (2004), the "'means of illicit exclusion, like the means of legitimate competition, are myriad.'" *Id.*, at 414 (quoting *United States* v. *Microsoft Corp.*, 253 F. 3d 34, 58 (CADC

2001) (en banc) *(per curiam)*).  They may involve a "course of dealing" that, even if profitable, indicates a "willingness to forsake short-term profits to achieve an anticompetitive end."  *Trinko, supra*, at 409.  See, *e.g.*, *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U. S. 585, 610–611 (1985); Complaint in *United States* v. *International Business Machines Corp.*, Civil Action No. 69 Civ. 200 (SDNY, filed Jan. 17, 1969), ¶20(c), reprinted in F. Fisher, J. McGowan, & J. Greenwood, Folded, Spindled, and Mutilated: Economic Analysis and *U. S.* v. *IBM* 357 (1983).  And, as Judge Hand wrote many years ago, a "price squeeze" may fall within that latter category.  *Alcoa, supra*, at 437–438.  As a matter of logic, it may be that a particular price squeeze can only be exclusionary if a refusal by the monopolist to sell to the "squeezed customer" would also be exclusionary.  But a court, faced with a price squeeze rather than a refusal to deal, is unlikely to find the latter (hypothetical) question any easier to answer than the former.

I would try neither to answer these hypothetical questions here nor to foreshadow their answer.  We have before us a regulated firm.  During the time covered by the complaint, petitioners were required to provide wholesale digital subscriber line (DSL) transport service as a common carrier, charging "just and reasonable" rates that were not "unreasonabl[y] discriminat[ory]."  47 U. S. C. §§201(b), 202(a) (2000 ed.).  And, in my view, a purchaser from a regulated firm (which, if a natural monopolist, is lawfully such) cannot win an antitrust case simply by showing that it is "squeezed" between the regulated firm's wholesale price (to the plaintiff) and its retail price (to customers for whose business both firms compete).  When a regulatory structure exists to deter and remedy anticompetitive harm, the costs of antitrust enforcement are likely to be greater than the benefits.  See *Town of Concord* v. *Boston Edison Co.*, 915 F. 2d 17, 26–29 (CA1 1990).

Cf. 3 P. Areeda & D. Turner, Antitrust Law ¶¶834–836, pp. 344–355 (1978) (whether a particular course of conduct counts as "exclusionary" for antitrust purposes depends upon a host of factors, including, for example, the market position of the defendant, the nature of the market, and the nature of the defendant's conduct).

Unlike *Town of Concord,* the regulators here controlled prices only at the wholesale level. See 915 F. 2d, at 29. But respondents do not claim that that regulatory fact makes any difference; and rightly so, for as far as I can tell, respondents could have gone to the regulators and asked for petitioners' wholesale prices to be lowered in light of the alleged price squeeze. Cf. *FPC* v. *Conway Corp.*, 426 U. S. 271, 279 (1976); 3 Areeda & Turner, *supra*, ¶726e, at 219–220.

Respondents now seek to show only that the defendant engaged in predatory pricing, within the terms of this Court's decision in *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U. S. 209 (1993). The District Court can determine whether there is anything in the procedural history of this case that bars respondents from asserting their predatory pricing claim. And if not, it can decide the merits of that claim. As I said, I would remand the case so that it can do so.