In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 22-2993

UNITED WISCONSIN GRAIN PRODUCERS LLC, *et al.*,

*Plaintiffs-Appellants*,

*v.*

ARCHER DANIELS MIDLAND COMPANY,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:20-cv-02314 — **Colin S. Bruce**, *Judge*.

_____

ARGUED SEPTEMBER 20, 2023 — DECIDED JULY 18, 2025

_____

Before RIPPLE, JACKSON-AKIWUMI, and LEE, *Circuit Judges*.

JACKSON-AKIWUMI, *Circuit Judge*. United Wisconsin Grain Producers LLC, joined by six other ethanol producers, brought this antitrust action against a competitor, Archer Daniels Midland Company (ADM). According to United Wisconsin Grain, ADM had a scheme to profit by manipulating indexes used to set U.S. ethanol prices, forcing United Wisconsin Grain to charge lower prices in its ethanol sales contracts. So, United Wisconsin Grain filed a complaint, and then

an amended complaint, alleging monopolization, attempted monopolization, and "market manipulation" under § 2 of the Sherman Act and parallel state law provisions. The district court granted ADM's motion to dismiss the case.

United Wisconsin Grain's theories of liability cannot prevail on appeal for three reasons. One, missing from United Wisconsin Grain's amended complaint is an allegation that ADM completed its predatory pricing scheme by charging monopoly prices to recoup its losses from below-cost prices, something monopolization claims require. Two, United Wisconsin Grain waived its challenge to the district court's dismissal of its attempted monopolization claim. Three, tacked onto the amended complaint is an allegation that ADM caused generalized harm to the market—what United Wisconsin Grain refers to as a "market manipulation" claim—but § 2 of the Sherman Act does not recognize this type of claim. Taken together, this means we affirm the district court's dismissal of the amended complaint.

## I

In reviewing a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6), we accept the facts as the plaintiff pled them. *See Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 819 (7th Cir. 2022).

Ethanol, a renewable resource made mostly from corn, fuels the parties' dispute. Refineries, blenders, and gasoline resellers can buy ethanol directly from a producer or at any of the 1,200 ethanol storage terminals across the country. The largest of these terminals is in Argo, Illinois ("Argo Terminal"). Ethanol prices attached to transactions that occur at the Argo Terminal determine the pricing indexes (namely, the

Chicago Benchmark Price, Chicago Ethanol Derivatives Prices, and Chicago Oil Price Information Service Prices). In turn, the pricing indexes determine ethanol prices in the U.S. ethanol market generally. And ethanol prices in the U.S. ethanol market determine the ethanol prices that find their way into sales contracts between producers and buyers.

United Wisconsin Grain and ADM sell ethanol. United Wisconsin Grain sells ethanol directly through contracts with buyers. ADM sells ethanol at the Argo Terminal, commanding 70 percent of the Argo Terminal market and around 10 percent of the U.S. ethanol market.

United Wisconsin Grain accuses ADM of using illicit tactics to manipulate ethanol prices. Each of the tactics involve charging below-cost prices (that is, prices less than the cost of producing a product) on ethanol to flood the Argo Terminal market, thereby depressing the price of ethanol at the Argo Terminal, the price indexes, and the price of ethanol in the U.S. market. ADM made up for its losses by purchasing and cashing in on ethanol futures that increased in value when the price of ethanol fell. By manipulating ethanol prices, United Wisconsin Grain alleges, ADM forced producers to charge less in their ethanol sales contracts.

United Wisconsin Grain, joined by six other producers, sued ADM, alleging that ADM engaged in monopolization and attempted monopolization in violation of § 2 of the Sherman Antitrust Act and parallel provisions of the Illinois Antitrust Act. *See* 15 U.S.C. § 2; 740 Ill. Comp. Stat. 10/3(3). The district court first determined that, when a plaintiff complains that a defendant committed a § 2 violation using below-cost prices, the plaintiff must do so within the confines of a predatory pricing claim. Then the district court set out the

elements of a predatory pricing claim: (1) the defendant sold products below cost, (2) exit from the market occurred or is imminent, and (3) the defendant can recoup by setting monopoly prices that injure consumers. It also noted the essential element of every § 2 claim: monopoly power in the relevant market (or a dangerous probability of achieving it).

The district court dismissed United Wisconsin Grain's antitrust claims with prejudice. In the court's view, the sole relevant market was the Argo Terminal (not the U.S. ethanol market in part, as United Wisconsin Grain contends), and United Wisconsin Grain did not allege that any producers exited the Argo Terminal. The court also considered United Wisconsin Grain's position that the Argo Terminal is the relevant market when considering the below-cost price requirement and the U.S. ethanol market is the relevant market when considering the monopoly price requirement. Even then, the court concluded, United Wisconsin Grain still failed to plead monopoly power in, and exits from, the U.S. ethanol market. Lastly, the district court declined to revisit its conclusion earlier in the case that United Wisconsin Grain did not need to show ADM eventually charged monopoly prices, and instead could allege ADM recouped its losses on its below-cost prices by trading ethanol futures.

United Wisconsin Grain now appeals.

## II

We begin with the relevant antitrust law framework. Section 2 of the Sherman Act prohibits three types of actions by one or more firms: monopolization, attempted monopolization, and conspiracy to monopolize. *See* 15 U.S.C. § 2. Illinois courts rely on federal caselaw to guide their analysis of state

antitrust law when the state law is substantially similar to federal law—as is the case with § 2 of the Sherman Act, *see* 15 U.S.C. § 2, and the relevant provisions of the Illinois Antitrust Act, *see* 740 Ill. Comp. Stat. 10/3(3). *People ex rel. Scott v. Coll. Hills Corp.*, 91 Ill. 2d 138, 150 (1982); *see also State of Ill., ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1479–80 (7th Cir. 1991). Consequently, the analysis of the § 2 claims in this case is dispositive for the claims based on the Illinois Antitrust Act.

We focus our attention on monopolization and attempted monopolization. A monopolization claim has two elements: (1) "the possession of monopoly power in the relevant market" and (2) "the willful acquisition or maintenance of that power" through exclusionary conduct. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). An attempted monopolization claim, which involves an unsuccessful or incomplete attempt to achieve a monopoly, has three elements: (1) specific intent to monopolize, (2) exclusionary conduct directed to accomplishing this purpose, and (3) a dangerous probability of achieving monopoly power. *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

Zero in on exclusionary conduct—a feature common to monopolization and attempted monopolization claims. Exclusionary conduct is behavior with anticompetitive effect, meaning it reduces competition and thereby harms consumers. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Whether an act is exclusionary, rather than a form of aggressive competition, can be difficult to discern.

Ultimately, our task is to distinguish between exclusionary acts, which decrease consumer welfare, and competitive acts, which increase it. *See A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1400 (7th Cir. 1989); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985) ("'[E]xclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way."). Courts recognize several forms of exclusionary conduct that can give rise to a § 2 violation—one of them is predatory pricing.

Predatory pricing—the exclusionary conduct alleged in this case—occurs when "[a] business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, (1993).

In the monopolization context, predatory pricing unfolds in two stages: (1) a firm charges a price below its cost (i.e., the predation phase) and (2) the firm later recoups its losses by charging a monopoly price (i.e., the recoupment phase). *See Am. Acad. Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1320 (7th Cir. 1991). In the attempted monopolization context, predatory pricing unfolds also in two stages: (1) a firm charges a price below its cost and (2) the dangerous probability of recoupment via monopoly prices arises. *See Brooke Grp.*, 509 U.S. at 222–24; *see also Am. Acad. Suppliers*, 922 F.2d at 1319–20.

Our analysis of United Wisconsin Grain's monopolization and attempted monopolization claims focuses on the second

half of the predatory pricing process—recoupment or the dangerous probability of recoupment via monopoly prices. And with this framework in mind, we now consider the parties' arguments about United Wisconsin Grain's § 2 claims.

## III

United Wisconsin Grain challenges the district court's dismissal of its § 2 monopolization and attempted monopolization claims, as well as the dismissal of its distinct § 2 "market manipulation" claim. As to the monopolization and attempted monopolization claims, United Wisconsin Grain argues that the district court erred in concluding that (1) the U.S. ethanol market is not a relevant market; (2) United Wisconsin Grain failed to allege that ADM had monopoly power in the U.S. ethanol market; and (3) United Wisconsin Grain failed to allege that producers exited the U.S. ethanol market. ADM contends that the district court erred in excusing United Wisconsin Grain from alleging recoupment via monopoly prices.

We agree with ADM that the failure to allege recoupment by way of higher prices dooms United Wisconsin Grain's monopolization claim; so, we need not reach the remaining elements.[1]

---

[1] We disagree with United Wisconsin Grain that ADM needed to file a cross-appeal to attack the district court's decision on recoupment. Prevailing parties need not file cross-appeals to correct errors in the district court's reasoning when that correction serves as an alternative ground for affirming a judgment. *See Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 439 (7th Cir. 1987).

We further conclude that United Wisconsin Grain waived its attempted monopolization claim, and its separate § 2 "market manipulation" claim has no roots in the law.

## A. Monopolization (Via Predatory Pricing)

Recall that to establish a monopolization claim premised on predatory pricing, United Wisconsin Grain must allege that ADM recouped its investment in the predatory pricing scheme and that it did so by charging monopoly prices.

The district court blessed United Wisconsin Grain's theory that ADM recouped by profiting from derivatives contracts— not higher prices. United Wisconsin Grain says it does not need to allege recoupment by way of monopoly prices: It was enough to allege that ADM "generate[d] supracompetitive profits from its own outsized investments in ethanol short derivatives whose value increased as a result of ADM's [low prices]." Even if events unfolded the way United Wisconsin Grain describes, however, those events did not result in the type of recoupment required to establish a monopolization claim based on predatory pricing.

"Recoupment" in the context of a predatory pricing scheme means profiting off monopoly prices charged at the end of the scheme—in other words, "charging higher prices *to consumers*." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 324 (2007) (emphasis added).

To determine whether a plaintiff sufficiently alleges recoupment, we ask whether the plaintiff identifies profits that flow from monopoly prices—not profits that flow from other financial maneuvers and strategies made possible by

completing the initial step of charging below-cost prices. The
Supreme Court has said as much before:

> [A] firm engaged in a predatory-pricing scheme
> makes an investment—the losses suffered plus
> the profits that would have been realized absent
> the scheme—at the initial, below-cost-selling
> phase. For that investment to be rational, a firm
> must reasonably expect to recoup in the long
> run at least its original investment *with su-
> pracompetitive profits* …. Recognizing the central-
> ity of recoupment to a predatory-pricing
> scheme, we require[] predatory-pricing plain-
> tiffs to demonstrate that there is a likelihood
> that the predatory scheme alleged would cause
> *a rise in prices* above a competitive level that
> would be sufficient to compensate for the
> amounts expended on the predation ….

*Id.* at 318–20 (cleaned) (emphasis added). In a separate deci-
sion, *Brooke Group*, the Supreme Court further explained: "In
order to recoup their losses, predators must obtain enough
market power to *set higher than competitive prices*, and *then must
sustain those prices* long enough to earn in excess profits what
they earlier gave up in below-cost prices." 509 U.S. at 225–26
(emphases added) (cleaned); *see also A.A. Poultry*, 881 F.2d at
1401 ("If the [predatory pricing] attempt fails, … the aggres-
sor …. surrenders the profits it could have made *by charging
the higher market price*." (emphasis added)).

United Wisconsin Grain warns that disallowing its theory
of recoupment means ADM remains incentivized to charge
below-cost prices because it can fully recoup its losses in real
time via derivatives contracts. But antitrust laws are designed

to benefit consumers; how ADM manages to profit from be-
low-cost prices in ways that do not harm consumers does not
matter. *See A.A. Poultry*, 881 F.2d at 1400. The recoupment re-
quirement ensures that any antitrust claim based on low
prices involves harm to consumers through eventual high
prices. And when low prices today do not precede high prices
tomorrow, consumers receive the "boon" of lower prices
(even if competitors must brave the curse of the same). *Brooke
Grp.*, 509 U.S. at 224. Under United Wisconsin Grain's theory,
the low prices ADM set in motion will remain low because
ADM profits from financial tools it purchased in the invest-
ment market. This is a benefit, not a burden, for consumers.

Ultimately, antitrust law cannot regulate below-cost
prices that do not eventually morph into monopoly prices
without stirring up the "'intolerable risks of chilling legiti-
mate' procompetitive conduct." *Weyerhaeuser*, 549 U.S. at 325
(quoting *Brooke Grp.*, 509 U.S. at 223). Because United Wiscon-
sin Grain failed to plead recoupment by way of monopoly
prices, we affirm the district court's order dismissing the § 2
monopolization claim.

### B.  Attempted Monopolization (Via Predatory Pricing)

On the second claim at issue—attempted monopoliza-
tion—we start with a threshold matter: United Wisconsin
Grain waived its right to challenge the district court's dismis-
sal of this claim. When discussing ADM's predatory pricing
scheme in its briefing, United Wisconsin Grain does not dis-
tinguish monopolization and attempted monopolization.
United Wisconsin Grain's discussion of "recoupment" makes
the lack of distinction particularly obvious: Every mention of
"recoupment" as applied to this case concerns historical,

completed "recoupment" (i.e., ADM "successfully 'recouped' its predatory losses," or a version of this), a monopolization claim requirement. None of the mentions concern future, incomplete recoupment (i.e., whether a "*dangerous probability* of recoupment" existed), an attempted monopolization claim requirement.

Our conclusion that United Wisconsin Grain waived its attempted monopolization claim accords with other parts of its briefing: It complains about actual, completed monopolization in the context of its § 2 claim based on ADM's alleged predatory pricing scheme, as well as in the context of its § 2 claim based on ADM's alleged "market manipulation" (which we discuss in the next section); but it complains about incomplete, "attempted" monopolization only in the context of its § 2 claim based on ADM's alleged "market manipulation." The following excerpt from the introduction of United Wisconsin Grain's reply brief illustrates this point well:

> Since the outset, ADM's position has been equally consistent. According to ADM, even if it manipulates pricing in the U.S. Ethanol Market with the intent to drive producer-competitors out of business and succeeds in doing so, it cannot be held liable for the harm it causes to anyone unless it ultimately succeeds in raising prices to downstream consumers. In fact, because ADM argues you cannot have an attempted monopolization claim based on predatory pricing, it is free to repeat its market manipulation over and over again until it succeeds. Of course, there is no economic disincentive for ADM to refrain from its market manipulation

scheme because it recouped its losses on ethanol sales in real time through its inflated gains on its ethanol derivatives. But, according to ADM, this actual recoupment does not count as antitrust recoupment because that can only come in the form of increased prices to consumers. ADM's position is untenable.

Consider another excerpt, in which United Wisconsin Grain describes the § 2 "market manipulation" claim that it contends the district court did not acknowledge, and note that it is framed in terms of ADM's alleged incomplete, "attempted" monopolization:

> ADM's anticompetitive market manipulation scheme was unique because ADM was able to profit in the derivatives market due to outsized investments in ethanol derivatives tied to the Chicago Price Indexes, and, at the same time, because the Chicago Price Indexes are used to also price physical ethanol, ADM could plan to profit in the physical ethanol market after the depressed prices it engineered drove competitors out of the market, allowing ADM to then impose supracompetitive ethanol prices.

Thus, we conclude United Wisconsin Grain waived its challenge to the district court's dismissal of the attempted monopolization claim.

### C.  "Market Manipulation"

We turn next to United Wisconsin Grain's "market manip-
ulation" claim. Here is how United Wisconsin Grain describes
it:

> Plaintiffs' allegations regarding the intercon-
> nected structure of the markets for ethanol and
> ethanol derivatives, combined with Plaintiffs'
> allegations regarding the nature of ADM's
> [market] manipulation (targeting both ethanol
> and ethanol derivatives), are sufficient to allow
> for plaintiffs to pursue their claims as a straight-
> forward Section 2 [market] manipulation mo-
> nopolization claim. In other words, Plaintiffs
> have adequately alleged a Section 2 monopoli-
> zation claim based on harm caused by ADM's
> intentional manipulation of the Chicago Price
> Indexes that are relied on for pricing both Chi-
> cago Ethanol Derivatives and ethanol sold in
> the U.S. Ethanol Market.

"[T]he primary goal of [ADM's] [market] manipulation,"
United Wisconsin Grain says, "was to impose predatory
prices in the U.S. Ethanol Market long enough to eliminate
capacity and that ADM hoped to ultimately lead[] to higher
prices in the U.S. Ethanol Market." We affirm the dismissal of
this "market manipulation" claim for two reasons.

First, Supreme Court precedent bars § 2 liability based on
generalized claims that a defendant's actions hurt the entire
market. The Court explained in *Atlantic Richfield* that "[the]
respondent [did not] satisf[y] the antitrust injury requirement
by alleging that the removal of some elements of price

competition distorts the markets, and harms all the partici-
pants." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339
n.8 (1990) (cleaned). Such claims, the Court explained,
"equate injury in fact with antitrust injury." *Id.* "Every anti-
trust violation can be assumed to 'disrupt' or 'distort' compe-
tition. Otherwise, there would be no violation." *Id.* (cleaned).
But "[t]he antitrust injury requirement cannot be met by
broad allegations of harm to the 'market' as an abstract entity.
Although all antitrust violations … 'distort' the market, not
every loss stemming from a violation counts as antitrust in-
jury." *Id.* (cleaned).

Second, when a plaintiff wishes to challenge a single firm's
below-cost prices, they can do so only by alleging predatory
pricing. The Supreme Court explained in *Pacific Bell Telephone
Co.* that, "[t]o avoid chilling aggressive price competition," it
"ha[s] carefully limited the circumstances under which plain-
tiffs can state a Sherman Act claim by alleging that prices are
too low." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S.
438, 451 (2009). Namely, "low prices are only actionable under
the Sherman Act" through the predatory pricing framework,
in which "the prices are below cost and there is a dangerous
probability that the predator will be able to recoup the profits
it loses from the low prices." *Id.* at 457; *see also Atl. Richfield*,
495 U.S. at 339 ("Antitrust injury does not arise … until a pri-
vate party is adversely affected by an anticompetitive aspect
of the defendant's conduct; in the context of pricing practices,
only predatory pricing has the requisite anticompetitive ef-
fect." (cleaned)); *R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*,
462 F.3d 690, 695 (7th Cir. 2006) ("Antitrust also has a frame-
work for assessing claims that low prices today will produce
monopoly tomorrow: predatory pricing."); *Am. Acad. Suppli-
ers*, 922 F.2d at 1319–20 (applying the predatory pricing

framework where the plaintiff complained of below-cost prices charged by a single firm).

United Wisconsin Grain points to a decision by a district court outside our circuit, *London Silver*, to support its contention that a plaintiff can challenge a defendant's below-cost prices outside the bounds of predatory pricing. In *London Silver*, the district court found plaintiff silver sellers adequately alleged antitrust injury because the defendants' manipulation of the Silver Fixing benchmark forced them to sell silver and silver derivatives at artificially low prices. *See In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 551–52 (S.D.N.Y. 2016). But we rejected this reasoning in *Ball Memorial*. There, the plaintiffs cited a Supreme Court case "to show that a [monopolistic] depression of price"—as argued in *London Silver* and as United Wisconsin Grain alleges in the context of its § 2 "market manipulation" claim—"is as bad as a monopolistic increase in price." *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir. 1986). "True enough," we said, "but [that case] was a *conspiracy* to depress prices" (as was *London Silver)*, "and price-fixing cartels are unlawful independent of their efficacy." *Id.* (emphasis added). By contrast, the defendant in *Ball Memorial* was a single firm (as is ADM), "and the acts of single firms are judged by a different standard under § 2." *Id.* Specifically, they are judged under the standards articulated in our monopolization and attempted monopolization jurisprudence. *See id.*

We therefore affirm the district court's dismissal of United Wisconsin Grain's § 2 "market manipulation" claim.

**IV**

The judgment of the district court is AFFIRMED.